# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CT-01553-SCT

*CARL RICHARD COOK a/k/a CARL R. COOK a/k/a*
*CARL COOK*

*v.*

*STATE OF MISSISSIPPI*[1]

## ON MOTION FOR REHEARING

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT:               09/10/2012
TRIAL JUDGE:                   HON. JOHN HUEY EMFINGER
COURT FROM WHICH APPEALED:  RANKIN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     CLARENCE TERRELL GUTHRIE, III
ATTORNEYS FOR APPELLEE:     MICHAEL A. BOLAND
                                  RICHARD H. WILSON
DISTRICT ATTORNEY:            MICHAEL GUEST
NATURE OF THE CASE:          CRIMINAL - MISDEMEANOR
DISPOSITION:                   REVERSED AND RENDERED - 03/12/2015
MOTION FOR REHEARING FILED:  10/29/2014
MANDATE ISSUED:

    **EN BANC.**

    **KING, JUSTICE, FOR THE COURT:**

¶1.    The motion for rehearing is denied.  The previous opinions are withdrawn, and these

---

[1]In the Notice of Appeal, this case is correctly styled ***State of Mississippi v. Carl Richard Cook***. Without explanation, the case style was changed to ***Carl Richard Cook v. Rankin County***, which does not comport with the mandate of Article 6, Section 169, of the Mississippi Constitution, that "all prosecutions shall be carried on in the name and by the authority of the 'State of Mississippi. . . .'" Miss. Const. art. 6, § 169. We have corrected the style of this case to bring it back in, compliance with the Mississippi Constitution.

opinions are substituted therefor.

¶2.     Carl Richard Cook was convicted of misdemeanor driving under the influence ("DUI"), first offense, in the Rankin County Justice Court. Cook appealed to the County Court of Rankin County. At a trial de novo before the county court, Cook's counsel moved to dismiss the case, claiming that the investigatory stop which led to Cook's arrest was an illegal search and seizure because it was based on an anonymous tip that lacked sufficient indicia of reliability. The county court denied the motion and entered a judgment of conviction. Cook then appealed to the Rankin County Circuit Court, and the circuit court affirmed the county court's conviction. Next, Cook appealed his conviction to this Court, and the case was assigned to the Court of Appeals. *Cook v. Rankin County*, ___ So. 3d ___, 2013 WL 6233891 (Miss. Ct. App. Dec. 3, 2013). Finding that the investigatory stop was legally justified, the Court of Appeals affirmed the judgment of the Circuit Court of Rankin County. Having granted Cook's Petition for Writ of Certiorari, we now consider whether the investigatory stop, which was based on an anonymous tip and led to Cook's arrest, violated Cook's Fourth-Amendment right to be free from unreasonable searches and seizures.

**FACTS AND PROCEDURAL HISTORY**

¶3.     Because the facts of today's case are not in dispute, they are quoted, in part, from the Court of Appeals' opinion:

> On March 12, 2011, Reservoir Patrol Officer Timothy Ware of the Pearl River Valley Water Supply District was on duty in the area of Northshore Parkway and Timber Lake Campground in Rankin County, Mississippi. Officer Ware received a call from the Reservoir patrol dispatch to "be on the lookout" (BOLO) for a vehicle that was driving erratically and the driver of the vehicle possibly flashing a badge of some sort.

2

Officer Ware did not know who made the initial call to law enforcement. To his knowledge, the "tip" was from an anonymous caller and was uncorroborated. The call described a gray Chevrolet Avalanche, and gave the license-plate number. Officer Ware saw a vehicle that matched the description he received. He turned his patrol vehicle around and proceeded behind the suspect Avalanche. Officer Ware observed the Avalanche for a short period of time, though he did not observe the vehicle driving erratically at that time. Nor did he observe the driver flashing a badge or committing any crimes.

Deputy Fred Lovett of the Rankin County Sheriff's Office was also in the area when the BOLO came over both the Reservoir patrol dispatch and the Rankin County Sheriff's dispatch. Deputy Lovett met the Avalanche head on. He then turned around and got within "a couple" of car lengths behind Officer Ware and the Avalanche.

Officer Ware initiated the stop on the Avalanche on Church Street in the Reservoir area. Based on subsequent interactions between Officer Ware, Deputy Lovett, and Cook, Cook was arrested for DUI, first offense.

Cook was convicted of misdemeanor DUI, first offense, in violation of Mississippi Code Annotated Section 63-11-30(1)(a) (Supp. 2012), in the Rankin County Justice Court. Cook appealed and received a trial de novo before the Rankin County County Court. In a non-jury trial before the county judge, Cook's counsel moved to dismiss the case at the conclusion of the State's case-in-chief. Cook argued that the BOLO that led to the investigatory stop violated his Fourth Amendment rights against illegal search and seizure, as it was based on an anonymous tip that lacked sufficient indicia of reliability. The county judge denied the motion and entered a detailed order overruling the motion to dismiss. The county judge also entered a judgment of conviction.

Cook then appealed his conviction to the Rankin County Circuit Court. As error, Cook argued that the county judge erred in the application of the Fourth Amendment standards regarding uncorroborated anonymous tips. The circuit court entered an opinion and order that affirmed the county court's conviction.

*Id.* at *1.

¶4.    The Court of Appeals affirmed the circuit court's judgment, finding that the stop did

not violate Cook's Fourth-Amendment rights. *Id.* at *6. Essentially, the Court of Appeals

found that there were sufficient indicia of reliability when the officers located a vehicle

3

matching the description of Cook's vehicle. *Id.* Further, the court held that the behavior reported – "reckless driving and impersonating a law enforcement official [–] . . . justified [the] investigatory stop to resolve the ambiguous situation." *Id.*

## ANALYSIS

¶5. In his Petition for Writ of Certiorari, Cook raised the following issue: "Whether law enforcement officers in Mississippi may conduct an investigatory stop on a vehicle based on an anonymous tip that lacks any corroboration . . . ."

¶6. This Court applies a mixed standard of review when considering Fourth-Amendment issues. *Eaddy v. State*, 63 So. 3d 1209, 1213 (Miss. 2011) (quoting *Dies v. State*, 926 So. 2d 910, 917 (Miss. 2006)). We apply de novo review when determining whether probable cause or reasonable suspicion exists. *Id.* But the de novo review is limited to the trial court's "decision based on historical facts reviewed under the substantial evidence and clearly erroneous standards." *Dies*, 926 So. 2d at 917.

¶7. An individual's right to be free from unreasonable searches and seizures is protected by the Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution. *See Eaddy*, 63 So. 3d at 1212-13 (citing U.S. Const. amend. IV; Miss. Const. art. 3, § 23; *Graves v. State*, 708 So. 2d 858, 861 (Miss. 1997)). Under the Fourth Amendment's protections, police officers may detain a person for an investigatory stop when the officers have "reasonable suspicion, grounded in specific and articulable facts" which allow "the officers to conclude the suspect is wanted in connection with criminal behavior." *Eaddy*, 63 So. 3d at 1213 (citing *Walker v. State*, 881 So. 2d 820, 826 (Miss. 2004)). Reasonable suspicion generally stems from one of two sources: an officer's personal

4

observation, or an informant's tip. *Eaddy*, 63 So. 3d at 1213 (citing *Williamson v. State*, 876 So. 2d 353, 355 (Miss. 2004)). "[A]n informant's tip may provide reasonable suspicion if accompanied by some indication of reliability; for example, reliability may be shown from the officer's independent investigation of the informant's information." *Eaddy*, 63 So. 3d at 1213 (citing *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000)).

¶8.     Cook cites *J.L.*, 529 U.S. 266, in support of his argument that the stop in today's case was not based on reasonable suspicion.   In *J.L.*, a young African-American male was charged with carrying a concealed firearm without a license and possessing a firearm while under the age of eighteen. *Id.* at 269.  J.L.'s arrest stemmed from an anonymous tip reporting that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."[2] *Id.* at 268.  Officers responded to the tip and found three young African-American males near the subject bus stop. *Id.*  One of the three males, J.L., had on a plaid shirt. *Id.*  The officers frisked J.L. and seized a gun from his pocket. *Id.*  J.L. eventually appealed his conviction to the United States Supreme Court, claiming that the search and seizure were invalid under the Fourth Amendment. *Id.* at 269.

¶9.     The Court in *J.L.* first noted that the search was based solely on the anonymous tip, as opposed to the officers' personal observations. *Id.* at 270.  Further, the tip came from an anonymous source, rather than a known informant. *Id.*  (quoting *Adams v. Williams*, 407 U.S. 143, 146-47, 92 S. Ct. 1921, 32 L. Ed. 2d (1972) ("an anonymous tip alone seldom

---

[2]The dissent attempts to distinguish this description, which described the person and his clothing, as well as describing his exact location, from this case, because the informant described the car as well as its location in the instant case.  Dis. Op. ¶33.  Yet the descriptions are virtually equivalent.

5

demonstrates the informant's basis of knowledge or veracity")).  But the Court recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *J.L.,* 529 U.S. at 270 (quoting *Alabama v. White*, 496 U.S. 325, 329, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)).  Thus, the relevant inquiry was "whether the tip pointing to J.L. had those indicia of reliability." *J.L.*, 529 U.S. at 270.  The Supreme Court found that it did not. *Id.* at 274.

¶10.  The Court's holding had two bases.  First, the anonymous call contained "no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* at 271.  Second, the accurate description of the subject's location and appearance, standing alone, is not a sufficient indicium of reliability:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse.  Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity.  The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. *Cf.* 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed. 1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases).

*Id.* at 272.

¶11.  Although the Court found in *J.L.* that the tip did not have sufficient indicia of reliability, the Court did recognize that there are some circumstances where the danger alleged may warrant a search without the requisite showing of reliability. *Id.* at 273.  For example, a call reporting that a person is carrying a bomb is distinguishable from a call

6

reporting that a person is carrying a firearm. *Id.* at 273-74. The dissent attempts to distinguish the case at hand, positing that a car, which officers did not observe violating any traffic laws, and about which no allegations of any sort of devastating weapons exist, is somehow an imminent danger. Dis. Op. ¶33. The Supreme Court specifically stated that it did "not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm." *J.L.*, 529 U.S. at 273-74. A firearm carries as much, if not more, potential for devastation as does a car. A bomb carries a much greater potential for devastation. Moreover, firearms and cars are both legal items, whereas a bomb is not. A car is more closely equated to a firearm, rather than a bomb.

¶12.    Similar to *J.L.*, this Court in *Eaddy*, 63 So. 3d at 1214, found that officers lacked reasonable suspicion to stop a vehicle after they received an anonymous tip stating that a man with three outstanding arrest warrants, Wendell Barnes, was driving a red Cadillac with Texas plates in Port Gibson. One officer was familiar with Barnes and could visually identify him. *Id.* at 1211. The officers eventually located a vehicle matching the informant's description and stopped the car. *Id.* Barnes was not in the car; but the officers saw a gun on the passenger seat, smelled alcohol, and saw an empty liquor bottle in the car. *Id.* One of the officers searched the driver of the vehicle, Terrance Eaddy, for officer-safety purposes and found two bottles of a white substance, which appeared to be cocaine. *Id.* Eaddy was arrested for possession of cocaine with intent to distribute and possession of a weapon by a convicted felon. *Id.* He then filed a motion to suppress evidence of the cocaine and the gun discovered during the search, and the trial court denied the motion. *Id.* On appeal, this Court found that the officers did not have reasonable suspicion to stop and search Eaddy, in part,

7

because the informant's tip did not provide reasonable suspicion to make an investigatory stop. *Id.* at 1214.

¶13.    Prior to *Eaddy*, this Court in *Williamson v. State*, 876 So. 2d 353 (Miss. 2004), affirmed a trial court's order denying a defendant's motion to suppress evidence obtained as a result of an anonymous tip. In *Williamson*, the defendant was arrested after police received a the following information:

> (1) two white males had come into Campbell's Big Star and purchased "large quantities" of Pseudoephedrine (also known as Sudafed); (2) these two individuals had also attempted to purchase Sudafed from the Family Dollar Store; (3) these two white males left Campbell's Big Star in a white van with license number 4BA 347, and headed west on Highway 84, also known as Azalea Drive.

*Id.* at 354. Apparently, the information received was from two sources, but the informants' identity was unknown. *Id.* Officers then spotted two men in the white van described in the tips parked at a Fred's Dollar Store, which also is known to sell Sudafed. *Id.* Officers eventually approached the van, searched it, and found chemicals which are "precursors" used in the manufacture of controlled substances. *Id.* The defendant appealed to this Court and contested the trial court's denial of his motion to suppress. *Id.* Finding that all of the details provided by the tips were verified by the officers prior to the stop, and considering that retail stores often called in these types of tips to police, this Court affirmed the trial court's denial of the defendant's motion to suppress. *Id.* at 356.

¶14.    We also have addressed reasonable suspicion in driving-under-the-influence (DUI) cases. In *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 112 (Miss. 1999), this Court upheld the defendant's DUI conviction, finding that reasonable suspicion to stop the

8

defendant was present. An off-duty police officer in *Floyd* received a tip from a known informant that a person was driving a red convertible Mustang in a reckless manner. *Id.* at 112. The off-duty officer relayed the information to a dispatcher, who radioed the information to an on-duty officer. *Id.* The on-duty officer then intercepted a car matching the description and eventually pulled over the car, although the officer never observed the Mustang driver violate any traffic laws. *Id.* at 112. The officer pulled over the vehicle and observed an open liquor bottle on the passenger side. *Id.* At that point, the driver exhibited signs of intoxication, including staggering while attempting to walk and slurred speech. *Id.*

¶15. Considering the accuracy of the informant's description of the vehicle in *Floyd* and the fact that the informant was known and had provided correct information to officers in the past, this Court found that the tip provided reasonable suspicion to stop the vehicle. *Id.* at 119. In its analysis, this Court cited with approval a Texas Court of Appeals case which noted that "a tip by unnamed informant of undisclosed reliability standing alone will rarely establish the requisite level of suspicion necessary to justify investigative detention." *Id.* at 118 (citing *State v. Sailo*, 910 S.W. 2d 184 (Tex. App. 1995)).

¶16. Today's case is distinguishable from *Floyd* and *Williamson*. In *Floyd*, 749 So. 2d at 112, the police officer who received the tip knew the informant, and the informant had provided correct information to the officer in the past. In today's case, the informant was anonymous. In *Williamson*, 876 So. 2d at 354, officers received tips from two sources and eventually located the suspects in the parking lot of a store known to sell "precursors." The informants had reported the suspects for purchasing "precursors" at other stores. *Id.* In today's case, one anonymous caller reported a person driving erratically and flashing what

9

appeared to be some type of badge at other drivers. This behavior was never observed by the officers in today's case prior to stopping Cook. While the dissent requires only that the readily identifiable description of the car be reliable, the United States Supreme Court requires more, in that the tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272. Put simply, the anonymous tip in today's case lacks the indicia of reliability that were present in previous cases before this Court.

¶17. Rather, today's case is similar to *Eaddy*, where an unknown informant reported that a person with outstanding arrest warrants was in a particular car. Like *Eaddy*, the officers here failed to take further action to corroborate the criminal activity reported in the tip prior to stopping Cook. Without taking further action to corroborate the criminal activity reported, the officers did not have reasonable suspicion to stop Cook. An accurate description of Cook's vehicle and location is insufficient. As the United States Supreme Court noted in *J.L.*, reliability of identification of a person and reliability as to the identification of criminal activity must be distinguished. *See J.L.*, 529 U.S. at 272 (A tip correctly identifying a person in a particular location "does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."). Further, permitting a stop solely on an anonymous tip such as the one here can open the door for legal stops based on tips provided by persons with intent to harass or embarrass others. *See id.* To be clear, however, today's opinion does not stand for the proposition that any anonymous tip, standing alone, will not sufficiently justify a search. For example, a report of someone

intending to carry out a mass shooting would not require the same indicia of reliability as a report of an erratic driver. *See **id.*** at 273.

¶18. The lack of sufficient indicia of reliability in today's case, coupled with the officers' failure to corroborate the criminal activity reported, results in the stop violating Cook's Fourth-Amendment right to be secure from unreasonable searches and seizures. As such, the trial court erred in denying Cook's motion to dismiss. For this same reason, the Court of Appeals erred in affirming the trial court.

**CONCLUSION**

¶19. The Court of Appeals erred in finding that reasonable suspicion to stop Cook existed in today's case. Therefore, we reverse the judgments of the Court of Appeals and the Rankin County Circuit Court affirming Cook's conviction. Without the evidence gathered as a result of the stop, the evidence against Cook is insufficient to sustain a DUI conviction. *See **Eaddy***, 63 So. 3d at 1216. As such, we reverse and render a judgment of acquittal.

¶20. **REVERSED AND RENDERED.**

**WALLER, C.J., DICKINSON, P.J., KITCHENS AND CHANDLER, JJ., CONCUR. PIERCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., LAMAR AND COLEMAN, JJ.**

**PIERCE, JUSTICE, DISSENTING:**

¶21. Respectfully, I dissent from the majority's decision to reverse Carl Cook's conviction for misdemeanor driving under the influence (DUI). Consistent with this Court's decision in *Floyd v. City of Crystal Springs*, 749 So. 2d 110 (Miss. 1999), both the trial court and the Court of Appeals correctly found that the authorities had reasonable suspicion to conduct an investigatory traffic stop in this instance.

11

¶22. At trial in county court, Cook moved to dismiss his DUI charge following the State's case-in-chief, on the basis that his Fourth-Amendment rights were violated. Cook claimed that authorities pulled him over based on a "be on the lookout" (BOLO) report from a police dispatcher that was based on an uncorroborated anonymous tip that lacked sufficient indicia of reliability. Cook thus argued that the stop was illegal and any evidence obtained by the authorities following the illegal stop was inadmissable. The county court preserved Cook's motion and ordered briefs from both parties on the issue. After receiving those briefs, the county judge denied Cook's motion and issued the following factual findings:

> On the afternoon of March 12, 2011, Officer Timothy Ware . . . and Deputy Fred Lovett . . . heard a BOLO ["be on the lookout"] . . . for a vehicle alleged to be driving erratically and/or recklessly, flashing its headlights at other motorists, and "flashing" what was purported to be a badge of some type in an apparent attempt to pull over other motorist(s). That BOLO, which came to both officers via official police radio channels, contained very specific information, including the make, model, color, and license tag number of a particular vehicle which was allegedly engaged in the potentially illegal conduct. The operator of the vehicle was also described in general terms in the BOLO. Finally, the area where the strange driving conduct was occurring was described with specificity[,] . . . an area within the jurisdiction of both [officers].

> Almost simultaneously, both officers spotted a vehicle matching the precise description given in the BOLO, down to the exact license number. Contact with that vehicle was made in the [officer's jurisdiction], the license number was verified by Officer Ware, and a traffic stop was immediately initiated by him, followed closely by back-up from Deputy Lovett. It is undisputed that Officer Ware did not personally observe any traffic violations by the subject vehicle and its operator prior to initiating the traffic stop. Upon the officers' approach to the vehicle, many indicia of [DUI] were immediately observed by them, including: smell of an intoxicating beverage, slurred speech, and disorientation of the operator. Further, within the first few moments of the encounter, [Cook] admitted to having consumed alcoholic beverage and to having "flashed" a business card, not a badge, at other motorist(s). [Cook]

12

also had "watery" eyes, swayed in a circular motion upon exit, and held on to the vehicle for support after exiting. A [p]ortable [b]reath [t]est (PBT) was administered to [Cook], and it registered positive for the presence of alcohol. Finally, Officer Ware reported that [Cook] was extremely nervous and disoriented throughout the original encounter and declined to take the Intoxilyzer 8000 test back at the station, stating that he " 'probably would not pass' " that test. For those and other reasons not mentioned herein, the court found proof beyond a reasonable doubt that [Cook] was, in fact, operating a motor vehicle while under the influence of alcohol.

¶23. The county judge's conclusions of law relied primarily on this Court's decision in *Floyd*. The county judge included the following language from *Floyd*, in which this Court held:

[G]iven reasonable circumstances an officer may stop and detain a person to resolve an ambiguous situation without having sufficient knowledge to justify an arrest. . . . Such an investigative stop of a suspect may be made so long as an officer has "a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a felony" . . . or as long as the officers have "some objective manifestation that the person stopped is, or is about to be engaged in criminal activity."

*Floyd*, 749 So. 2d at 114.

¶24. Applying *Floyd*, the county judge concluded:

In the instant case, the BOLO carried information about reckless/erratic driving. However, it included the additional information that the driver of the vehicle had been flashing his lights at other motorists and flashing what appeared to the reporter in this case to be some type of badge. Not only were these officers confronted with a report of dangerous driving conduct, but they were also alerted to the very real possibility that someone might be impersonating a law enforcement officer and attempting to pull over unsuspecting members of the motoring public. If there was ever an ambiguous situation which warranted immediate investigation, this was such a situation. The report of reckless driving was enough. As the Court held in Floyd, . . . "[t]o cling to a rule which would prevent a police officer from investigating a reported complaint of reckless driving would thwart a significant public interest in preventing the mortal danger presented by such driving." *Id*. Add to that the potential criminal nature of the other bizarre conduct described in

13

the BOLO and the potential danger to the public from one pretending to be a law enforcement officer, and the officers in this case could have been outright derelict in the duty to protect the public had they not acted swiftly as they did here.

It should also be noted that the information contained in the BOLO in the instant case was very specific. The offending vehicle was described by make, model, color, exact license number, and location. Before making the stop, the officers verified every one of those facts as being present in [Cook]'s vehicle. Under the totality of those circumstances, the balancing test here goes strongly in favor of the law enforcement officers, particularly compared to the brief intrusion into the travels of [Cook] for purposes of resolving the obviously ambiguous situation described in the BOLO. According to the credible testimony, the interaction with [Cook] following the stop would likely have been very brief but for the indicia of intoxication displayed by [Cook] immediately upon contact with the officers. The fact that things went rapidly and steadily downhill for [Cook] following that contact does not enter the equation; what matters is what happened before the stop.

. . . .

Under all the circumstances of this case, . . . this court finds that the facts herein not only allowed but in effect mandated the law enforcement action taken here via investigatory stop. The details of the BOLO, and the officer's confirmation of those details within minutes by spotting the exact vehicle exactly where the BOLO had stated it would be, create the constitutionally mandated "sufficient indicia" of reliability.

## DISCUSSION

¶25. As noted by the majority, seldom will an anonymous tip of undisclosed reliability, standing alone, establish the requisite level of suspicion necessary to justify an investigative detention. *Floyd*, 749 So. 2d at 118. That is because "ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations, and an anonymous tipster's veracity is 'by hypothesis largely unknown, and unknowable.'" *Navarette v. California*, 134 S. Ct. 1683, 188 L. Ed. 2d 680, 134 S. Ct. at 1688 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)). Under appropriate

14

circumstances, however, "an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop.'" *Id*. (quoting *White*, 496 U.S. at 327).

¶26.    We spoke to this in *Floyd*, which, as the majority points out, is distinguishable from the case before us, in that, unlike here, the person who called authorities was not anonymous. *Floyd* expressed, though, again as the majority points out, that an anonymous tip can be sufficiently credible and reliable and provide sufficient basis of knowledge to justify an investigatory stop. *Floyd*, 749 So. 2d at 119 (citing *State v. Melanson*, 140 N.H. 199, 665 A.2d 338, 340-41 (1995)) (holding that unknown caller's report that provided a specific description of a car whose driver was thought to be intoxicated, knowledge of its exact location at the time, and specific information of its movements, reasonably supported the conclusion, for the purpose of determining whether officer had reasonable suspicion to stop the vehicle, that the basis of the caller's knowledge was his personal observation of the vehicle).

¶27.    *Floyd* reiterated that the test is "one of reasonableness, and neither this Court nor the United States Supreme Court has articulated a concrete rule to determine what circumstances justify an investigatory stop." *Id*. (citing *Green v. State,* 348 So. 2d 428, 429 (Miss. 1977)). The question must be approached on a case-by-case basis. *Id*. In determining the reasonableness of an investigatory stop "less intrusive than a traditional arrest depends 'on a balance between the public interest and the individual's right to personal security from arbitrary interference by law officers.'" *Id*. (quoting *Brown v. Texas*, 443 U.S. 47, 50, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979)). "Consideration of the constitutionality of seizures

15

involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id*. (quoting *Brown*, 443 U.S. at 50-51).

¶28. Here, Officer Ware received a "BOLO" report of a vehicle that was driving erratically and whose driver was flashing what appeared to be a law-enforcement badge at other motorists. The report provided the vehicle's location and gave a very specific description of the vehicle–its make, model, color, and license-plate number. Upon receiving the report and spotting the vehicle, Officer Ware proceeded behind the vehicle and verified the vehicle's license-plate number with the number reported. Officer Ware observed no erratic driving patterns by the motorist. Concerned, though, with the report that the driver of the vehicle had flashed what purported to be a law-enforcement badge at another motorist, Officer Ware felt obligated to stop the vehicle to investigate what had been reported. According to Officer Ware, he decided to make contact with the vehicle in order to find out "if there was a police officer in some distress, a police officer in route to something, . . . or if somebody was impersonating a police officer."

¶29. Based on the information relayed to Officer Ware, it cannot be said that Officer Ware lacked reasonable grounds to act. As the county court found, "[u]nder the totality of those circumstances, the balancing test here goes strongly in favor of the law enforcement officers, particularly compared to the brief intrusion into the travels of [Cook] for purposes of resolving the obviously ambiguous situation described in the BOLO."

¶30. Indeed, the circumstances of this case presented an "ambiguous situation," which necessitated a common-sense response. As articulated by Officer Ware, his concern, based

16

on the "bizarre" conduct reported to and relayed by the 911 dispatcher, was not just for the safety of other motorists, but also for the subject individual's. Given that a possible emergency situation was at hand, Officer Ware reasonably acted as expected.

¶31. *Floyd* explained:

> The local policeman . . . is also in a very real sense a guardian of the public peace and he has a duty in the course of his work to be alert for suspicious circumstances, and, provided that he acts within constitutional limits, to investigate whenever such circumstances indicate to him that he should do so.

*Floyd*, 749 So. 2d at 117 (quoting *United States v. West*, 460 F.2d 374, 375-76 (5th Cir. 1972)). Acknowledging the community-caretaking function, adopted by other jurisdictions and ultimately by this Court in *Trejo v. State*, 76 So. 3d 684 (Miss. 2011), *Floyd* said: "The question is whether there were reasonable grounds to believe that some kind of an emergency existed, that is, whether there was evidence which would lead a prudent and reasonable official to see the need to act." *Floyd*, 749 So. 2d at 117 (quoting *State v. Alexander*, 124 Md. App. 258, 721 A.2d 275 (Spec. App. 1998)); *see also Trejo*, 76 So. 3d at 689 ("The question becomes whether a reasonable person, given the totality of the circumstances, would believe the individual is in need of help, or that the safety of the public is endangered.").

¶32. As noted in *Trejo*, *Floyd* did not expressly adopt the community-caretaking rule, because the *Floyd* Court upheld the stop at issue in that case as reasonable under the reasonable-suspicion standard. In my opinion, this case does not necessarily fall under the community-caretaking rule because, as the aforementioned facts plainly illustrate, the reported information was sufficiently credible and reliable to provide a sufficient basis of knowledge to justify Officer Ware's stop of the vehicle. On the other hand, however, given

17

Officer Ware's testimony, the circumstances of this case do meet the standards enunciated by this Court in *Trejo*.

¶33. Nor do I find the circumstances of the case before us on par with the United States Supreme Court's decision in *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000). There, in a relatively brief unanimous ruling, the high court held that, absent any other indicia of reliability, an anonymous tip that an individual was in possession of a firearm did not justify a stop and frisk. In so holding, the Supreme Court rejected the government's argument that firearms were sufficiently dangerous in and of themselves to justify dispensing with the requirement of reliability. The Court, however, was particularly careful to limit its holding to the facts of the case before it, explaining: "The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." *Id*. at 267. The Court held only "that an anonymous tip lacking indicia of reliability of the kind contemplated in . . . *White* does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." *Id.*

¶34. *J.L*. differs from the case before us in several respects. First, the information here was more reliable. The Court in *J.L.* emphasized that the anonymous tipster had provided nothing more than a bare-bones description of an individual simply standing at a bus stop. *Id*. at 273. There was none of the "predictive" information about individuals' movements which lent credibility to the anonymous informant in *White*, *supra*. Whereas here, another motorist provided a detailed description of the subject vehicle that was on the move and accurately predicted its exact location, information which Officer Ware confirmed within

18

moments of the call. Second, and moreover, the *J.L*. Court noted the relative lack of urgency confronting the investigating officers. While acknowledging that guns are dangerous, the *J.L*. Court analogized the situation to one involving an anonymous tip concerning the possession of narcotics. *Id*. In either case, the contraband could pose a potential public risk, but in neither is the danger necessarily imminent. *Id*. Not so here. In determining the validity of Officer's Ware's stop, it is not unreasonable to consider both the risk of harm resulting from a failure to stop the vehicle, based on the reasons articulated by Officer Ware, and the level of intrusiveness occasioned by a detention. *See State v. Richardson*, 156 Wis. 2d 128, 456 N.W.2d 830, 834 (1990) (reasonableness of stop "is a common sense question, which strikes a balance between the interests of society in solving crime and the members of that society to be free from unreasonable intrusions") (internal quotation marks and citation omitted). The police intervention in this case consisted of a brief motor-vehicle stop and inquiry, "not a hands-on violation of the person." *See State v. Boyea*, 171 Vt. 401, 410, 765 A.2d 862, 868 (2000) (holding that police officer could make investigative stop of vehicle based on anonymous tip that vehicle was operating erratically, without personally observing incriminating behavior). The "liberty interest at stake" in the case before us "did not rise to the level which confronted the Court in *J.L*." *Boyea*, 765 A.2d at 868.

¶35. Under the above-stated circumstances of this case, a reasonable officer could not have pursued any other prudent course. And I would affirm Cook's DUI conviction. For these reasons, I respectfully dissent.

**RANDOLPH, P.J., LAMAR AND COLEMAN, JJ., JOIN THIS OPINION.**

19